UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOHN CHERRY<br>Plaintiff | * | |
| | * | CIVIL ACTION |
| v. | * | NO. 08-228-FJP-CN |
| SHAW COASTAL, INC. AND<br>MICHAEL REASONER<br>Defendants | *<br><br>* | |

* * * * * * * * * *

**OPPOSITION AND INCORPORATED MEMORANDUM OF LAW TO THE MOTIONS FOR SUMMARY JUDGMENT FILED BY JOHN CHERRY and SCOTT THORNTON**

MAY IT PLEASE THE COURT:

John Cherry, defendant-in-counterclaim, has moved for summary judgment on the counterclaim filed against him by Michael Reasoner on September 8, 2008. Scott Thornton, against whom a third-party action has been filed, has similarly moved for summary dismissal of the action against him and adopted the reasons stated by Cherry. The Motions are without merit and should be denied.

FACTS

John Cherry, having resigned from employment with Shaw Coastal, Inc., in late September, 2007, filed this action in April, 2008, against Shaw Coastal, Inc., and Michael Reasoner claiming that in late March and early April, 2007, he was "sexually harassed" by Reasoner and that his complaints to Shaw about the "harassment" went unaddressed. According

1

to Cherry, the nature of the "harassment" was Reasoner's rubbing Cherry's hair, shoulders, leg or his "butt"[1]. Cherry describes these incidents as occurring on the work site, in either a crew cab work truck or a boat or the dock, and once while he was sleeping on the job[2]. Cherry also complained of "sexual" text messages he allegedly received from Reasoner's cell phone. He claims his resignation from Shaw was precipitated by Reasoner intentionally "shoulder-chucking" him in an office hallway on two occasions, in August and September, 2007.

Intriguingly, according to Cherry, all of these complained-of "touchings" took place on the job, and all of them occurred *only* when Cherry was on the work crew with, and mostly in the presence of, Scott Thornton, Cherry's friend and "immediate supervisor".[3]

Reasoner answered the Complaint and filed a counterclaim against Cherry and third-party action against Thornton on September 5, 2008. The operative allegations of the counterclaim filed against Cherry and against his co-worker Scott Thornton by way of third-party claim, are these:

> 5
> On or about Sept 5, 2007, the Reasoner learned from a co-employee, Lacy Vedros, that prior to Cherry's report to Shaw's Human Resources Department of Reasoner's alleged sexually harassing conduct, Cherry and Thornton been informing other co-workers of their mutual employer, Shaw, that Cherry had been subjected to homosexual harassment by Reasoner.
> 6
> Vedros was neither Cherry's supervisor nor an employee of Shaw employed

---

[1]   Ex. 1 - Cherry Deposition, Vol. I, p.62, ll. 10-16, p. 66, ll. 3-16

[2]   Ex. 2 - Cherry Deposition, Vol. II, p.330, ll.13 - 21

[3]   Ex. 2 - Cherry Deposition, Vol. II, p. 298

in its Human Resources Department and neither Vedros, nor any other Shaw employee who was neither Cherry's supervisor nor an employee of Shaw employed in its Human Resources Department had any need or reason to know the allegations made by Cherry against Reasoner.

. . .

11

After Cherry's allegations were found unsubstantiated by an internal investigation conducted by Shaw, Cherry continued to claim to other employees of Shaw having no need or reason to know of same that he had been sexually harassed by Reasoner.

12

Upon information and belief it is alleged that Cherry and Thornton mutually agreed to engage in conduct which would provoke Reasoner into either quitting his job or result in the termination of his employment with Shaw.

In his Motion for Summary Judgment Cherry seeks dismissal of the claims against him on grounds that they are a) prescribed, b) are subject to a "conditional privilege" and c) cannot be maintained for want of evidence of "malice".

I. THE COUNTERCLAIM WAS FILED WITHIN ONE YEAR OF REASONER'S BECOMING AWARE OF THE FACTS UNDERLYING THE CLAIM

Reasoner first became aware of Cherry's complaints of sexual harassment against him on information from Human Resources Manager Nikki Jordan on or about June 18, 2007. On July 24, 2007, Jordan and three Shaw managers, Oscar Pena, Jeff Pena and Hillary Thibodeaux met with Reasoner to conclude the investigation, informing him that they found Cherry's accusations not warranting further action.

On September 5, 2007, Reasoner was approached by Lacy Vedros, a Shaw administrative employee, who told Reasoner that Cherry and Thornton had continued to allege that he was sexually harassed by Reasoner subsequent to the conclusion of the investigation and that they

had made these claims to other employees even before Cherry had lodged his complaints with Shaw's Human Resources department on June 8.[4]

This was the first time that Reasoner became aware of the activity that Cherry and Thornton had been engaged in *prior* to Cherry's formal complaint to Human Resources. The prescriptive period did not commence from when Cherry made his injurious statements. It runs from the date Reasoner learned of the statements Cherry made. That date was September 5, 2007.

II. CHERRY CANNOT ASSERT A CLAIM OF CONDITIONAL PRIVILEGE FOR STATEMENTS HE MADE CONCERNING HIS CLAIMS OF "SEXUAL HARASSMENT" TO PERSONS HAVING NO NEED TO KNOW OF THEM FOR BUSINESS REASONS.

Reasoner does not dispute that there exists a conditional privilege for Cherry's allegations to his Shaw supervisors and the Shaw Human Resources department. However, Cherry engaged in conduct for which no conditional privilege can be asserted.

> The essential elements of a conditional privilege are "good faith, an interest to be upheld and a statement limited in scope to this purpose, a proper occasion, and publication in the proper manner and to proper parties only." ... A conditional privilege is applicable if the communication is made (a) in good faith, (b) on any subject matter in which the person communicating has an interest or in reference to which he has a duty, (c) to a person having a corresponding interest or duty.

Aranyosi v. Delchamps, Inc., 739 So.2d 911, 916 1998-1325 La.App. 1 Cir. 6/25/99,(La.App. 1 Cir. 1999). (citations and footnotes omitted)

Cherry insists on missing the point of the allegations clearly made against him in this matter. Cherry went beyond complaining to his superiors and intentionally engaged in conduct he hoped would defame Reasoner to co-workers who had no reason to be informed of Reasoner's alleged

---

[4]     Ex. 3 - Affidavit of Michael Reasoner

"sexual harassment". Cherry's actions do not satisfy the requirement for assertion of the conditional privilege.

On January 21, 2009, Wendy Falgout, a "drafter" in the Shaw survey department, was deposed in this matter. Falgout's description of Cherry's conduct reveals that, far from keeping the matter within the chain of "need to know" supervisors, Cherry was spreading his lurid tales among his co-workers prior to even making a complaint to his supervisors or Shaw's Human Resources department.

EXAMINATION MY MS. LAFLEUR

Q. Did Mr. Cherry tell you at any time that he had complained to a supervisor or HR about Mr. Reasoner?

A. Yes.

Q. When was that?

A. For weeks he had said that he talked to Jeff; he talked to Hilary and just nobody -- everybody just thought it was a joke.

Q. Did he tell you this in 2007?

A. At the time it was happening, yes.

Q. Was it early 2007 or was it around the time that you had witnessed the (hallway) incident?

A. For that whole period.

Q. What whole period?

A. When it started and when they started going out in the field.

(Exhibit 4, Falgout Deposition p. 23, l. 20 through p.24, l. 11)

EXAMINATION BY MR. BURAS

...did he come to you with these stories close to the time they happened?

      A. Yes.

      Q. So he said today this guy said you wouldn't believe -- did he say something like that?

      A. Yes. I don't know if it was today, yesterday, last week.

      Q. But your impression was that it was happening?

      A. Yes, it was happening. That's only what I'm being told. I'm not saying whether it did or not.

      Q. I understand that. How many occasions would he come to you with stories?

      A. It was two or three times that he came into the survey department letting us all know.

      Q. It wasn't just a conversation with you. It was sort of broadcasted inside the survey department?

      A. Well, not broadcasting, no. But I think how we're all aware how interoffice chitchat is.

      Q. No. You'll have to tell me. So it wasn't a personal conversation; it was within whoever was in earshot?

      A. Right.

(Exhibit 4, Falgout Deposition p. 27, l. 14 through p. 28, l. 17)

      EXAMINATION BY MS. RISEY:

      Q. Tell me a little bit more; you mentioned some office chitchat. Who was involved in this office chitchat?

      A. Concerning what?

      Q. You testified earlier that there was office chitchat, that Mr. Cherry engaged in office chitchat about the issues with Mr. Reasoner. Who else was present during the office chitchat?

      A. When this subject came up I believe it was just Matt and Murphy and I within the survey department.

      Q. Were any of you Mr. Cherry's immediate supervisors?

A. No.

(Exhibit 4, Falgout Deposition, Page 49, ll. 6 -31)

Falgout's testimony confirms Vedros' report to Reasoner that Cherry had been spreading his "sexual harassment" allegations around the workplace.

Falgout's testimony is also directly contrary to what Cherry claims. He claims he never discussed anything about the "sexual harassment" with Falgout until *after* the hallway incidents in the Fall of 2007.

EXAMINATION BY MR. BURAS

Q. Did you ever come back to Shaw 3 headquarters during these incidents with Reasoner and complain to Wendy Falgout that 5 you were being sexually harassed?

A. I don't think I ever told Wendy that I was being sexually harassed until after she asked what happened and when she saw him hit me in the hallway, if I recall.

...

Q. Okay. So it's your testimony that you never told anyone about these sexual harassment incidents except those who had a need to know in the chain of command?

A. I don't recall telling anybody else. I mean I know that I told Scott, and D'Angelo was told a few times prior going to Jeff, and then I'm assuming it went to Oscar after that. I don't remember talking to Oscar myself about it until after it had already come out.[5]

---

[5] Ex. 2 - Cherry Deposition, Volume II, Page 324, ll. 1 - 9, page 325, l . 25 - page 326, l. 10

Neither Falgout nor anyone else in the "survey department" was in Cherry's chain of command. Falgout specifically denied being Cherry's "supervisor". To work around this legal inconvenience, Cherry claims in his Memorandum in Support of Motion for Summary Judgment, page 12, that "Wendy Falgout and Murphy Dupre ... were also charged with the responsibility to monitor their workplace for harassment." This is Cherry's disingenuous attempt to bootstrap Falgoust and Dupre into the chain of persons with whom "privileged" communication may be had. It is ostensibly grounded on a directive in the Shaw Group's Harassment policy which, in defining the "Responsibility Matrix" states:

> Each Employee has the responsibility for monitoring their workplace and taking appropriate action to ensure that harassment does not occur.[6]

Neither Falgout nor Dupre were witnesses to any of the alleged sexual harassment, and if listening to Cherry's tales constituting "monitoring" neither took any apparent action, appropriate or otherwise. What *is* apparent is Cherry's violation of two *other* clearly stated directives of the Harassment Policy:

> Any Employee who believes that he/she has been subjected to harassment has the responsibility for immediately reporting the situation to their supervisor or Human Resources representative. If the complaint involves the supervisor, the Employee should directly contact Human Resources or the Human Resources Compliance Director. Refer to section 8.1 for more specific guidelines.

> **All participants in an investigation are required to maintain the confidentiality of the investigation.[7]**

---

[6]   Ex. 5

[7]   Ex. 5 (emphasis added)

Cherry cites case law for the proposition that *all* communications "within the employer's walls" are subject to a conditional privilege. This is both a mis-characterization of what the cases he cites say and directly contrary to what Shaw's policy required. What distinguishes the scenario presented by Falgoust from those in the cases cited by Cherry is that the cases cited involved statements made during an internal investigation of an employee by and between the employee and "**supervisory personnel essential to the investigation - not third persons to whom the statements were communicated or publicized**." Cangelosi v. Schwegmann Bros. Giant Super Markets, 390 So.2d 196, 198 (La., 1980), cited with approval in Johnson v. Delchamps, Inc., 715 F.Supp. 1345 (M.D. La., 1989) . (emphasis added)

Cherry's tales carried to the survey department were calculated to do one thing only, embarrass and ostracize Reasoner.

III.  REASONER'S ALLEGATIONS OF MALICIOUS INTENT ON THE PART OF CHERRY AND THORNTON ARE SUPPORTED BY THE TESTIMONY OF A CO-WORKER.

On August 31, 2009, a deposition was conducted of Roy Samperi, who was an "engineer tech II" with Shaw at the time of the alleged incidents complained of by Cherry. Scott Thornton, who was deposed on June 23, 2009, placed Samperi at the scene of Reasoner's alleged "sexual harassment".

Q. Did Mr. Samperi witness any of that?

A. I'm taking the assumption yes. I don't know. I don't know. I'm not him.

Q. But he was present?

A. But he was present, he should have witnessed it, yes.  I'm pretty sure he dld.

Q. How many times do you think that happened?

A. Numerous times.[8]

For his part, not only did Samperi deny ever witnessing Reasoner's alleged sexual harassment, he repeatedly stated that this entire sexual harassment claim was a fiction created by Cherry and Thornton to provoke the termination of Reasoner's employment.

> Q. Now, you understand that Mr. Cherry claims that Mr. Reasoner sexually harassed him?
>
> A. Yes, I do.
>
> Q. Do you have any understanding or belief why you think Mr. Cherry would say that?
>
> MS. CRAFT:
>
> I'm going to object. Speculation. 1-
>
> A. Yeah. This is just my opinion. Yes. I think they were trying to get him fired. :
>
> BY MS. CULOTTA:
>
> Q. Why? What is that based on? Why did you come to that opinion?
>
> A. Because we didn't like him. He did a lot of things that we could get him in trouble for if we could prove it. They couldn't prove it. So I assume they manufactured something.
>
> Q. Is it your belief that you don't think that Cherry is being truthful when he says that Mr. Reasoner harassed him?
>
> A. All I know is, if I tried to touch John Cherry in an inappropriate way, I'd be picking myself up off the dirt.

---

[8]   Ex. 6 - Thornton Deposition, p. 136, l. 21 - p. 137, l. 4

( Ex. 7 - Samperi deposition p. 16, l. 17 through p. 17, l. 13)

   BY MS. CULOTTA:

Q. Is it your testimony that you think that Mr. Cherry and Mr. Thorton are collaborating, concocted a story claiming that Mr. Reasoner sexually harassed Mr. Cherry in order to get Mr. Reasoner fired?

   MS. CRAFT:

Object to the form.

A. Yes. That's what I assume. I had talked about it with them. I made it clear I didn't believe them. I also said, If you're trying to get the guy fired, get him fired for something he's doing. Not for something you all made up. Now, all this is just me talking to them.  They never admitted that they made it up. But I never believed it for a second. And I advised them if they were making it up, to desist.

( Ex. 7 - Samperi deposition. p. 19, ll.8-25)

   BY MS. CULOTTA:

Q. So you, Mr. Cherry and Mr. Thorton all discussed  together -

A. Yes.

Q. - trying to get Mr. Reasoner fired?

A. Not trying to get him fired. I'm just saying he wouldget fired if we reported it. If we could prove it.

Q. You wanted Mr. Reasoner fired, too?

A. No. I just didn't like him. He didn't bother me on my  job. I ignored him.

> Q.     Is it your testimony that you believe Mr. Cherry and Mr. Thorton wanted him fired?
>
> MS. CRAFT:
>
> Object to the form.
>
> A.     In my opinion, yes.

( Ex. 7 - Samperi deposition. p. 20, ll.12-20)

> BY MS. CULOTTA:
>
> Q.     Did they say or do anything to demonstrate that to you?
>
> MS. CRAFT:
>
> Asked and answered.
>
> A.     Other than we had talked about it beforehand, about how if we caught him doing what he normally does, we could get him in trouble. And also, knowing that John Cherry, which I believe to be a super-homophobic person, there's no way he'd let someone lay his hands on him without bruising his knuckles. So I assumed it didn't happen. And I still feel that way.
>
> BY MS. CULOTTA:
>
> Q.     Did Mr. Cherry every threaten you with physical violence?
>
> A.     Yeah, as a matter of fact. If I said something - well, the one time that they come complaining about Michael being suggestive to him, I had said something like, "Well, wear that little black dress." And he was very upset. So I never repeated anything sexual to him like that again.
>
> Q.     You were joking with him?
>
> A.     Yeah. I was joking with him. But he was very sensitive about it.

( Ex. 7 - Samperi Deposition p. 20, l. 12 through p. 21, l. 23)

In <u>Fontenot v. Fontenot</u>, 235 La. 488, 104 So.2d 431 (La 1958) the Louisiana Supreme Court observed:

> Article 2315 of the Louisiana Civil Code provides that every act of man which causes damage to another obliges him by whose fault it happened to repair it. In <u>Acme Stores v. Better Business Bureau</u>, 225 La. 824, 74 So.2d 43, 44, a libel and slander suit was dismissed in the trial court on exception of no cause of action. This court overruled the exception, saying: 'A plaintiff suing for damages for an alleged slander or libel, or both, is not called on to state verbatim the words on which he bases his cause of action. All that he is required to do is to allege a state of facts or a condition of things such as would show such fault on the part of the defendant, as is contemplated under Article 2315 of the LSA-Civil Code, with the resulting damages he claims. See <u>Covington v. Roberson</u>, 111 La. 326, 35 So. 586; <u>Vicknair v. Daily States Publishing Co.</u>, 153 La. 677, 96 So. 529.'
>
> In <u>Mundy v. Gentilly Oaks</u>, 227 La. 118, 78 So.2d 530, 533, a charge of libel and slander was held by the district court to state no cause of action. We overruled the exception, being of the opinion that 'While the mentioned statements are not slanderous per se, plaintiff has specifically alleged that they were false and were made maliciously with resultant injury to his personal and business reputation. These allegations, under our jurisprudence, are [235 La. 492] sufficient for stating a cause of action * * *. <u>Fellman v. Dreyfous</u>, 47 La.Ann. 907, 17 So. 422; <u>New Iberia Extract of Tabasco Pepper Co. v. E. McIlhenny's Son</u>, 132 La. 149, 61 So. 131; <u>Vicknair v. Daily States Publishing Co.</u>, 153 La. 677, 96 So. 529.

<u>Id</u> at 432.

CONCLUSION

Samperi can hardly be called a witness "friendly" to Reasoner, having testified that he had a personal dislike of Reasoner and would just as soon have seen him fired.  Nevertheless, Samperi put no credence in Cherry's "sexual harassment" complaints and thought the entire matter a fiction concocted by Cherry and Thornton.

Reasoner has produced facts supporting the allegations of his complaints against Cherry and Thornton and is entitled to prove these allegations at trial and have determined  Cherry's and

13

Thornton's liability for their actions.

The motions for summary judgment filed by John Cherry and Scott Thornton should be denied.

Respectfully Submitted,

*[signature]*
Gilbert R. Buras, Jr.  (LSBA No. 3652)
710 Carondelet Street
New Orleans, Louisiana, 70130
Telephone: (504) 581-4334
Facsimile: (866) 257-3697

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served upon opposing counsel through the CM/ECF filing system on this day, November 19, 2009.

*[signature]*
Gilbert R. Buras, Jr. (La Bar #3652)