# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**JOHN CHERRY**

**VS.**                                    **CA NO. 08-228-FJP-CN**

**SHAW COASTAL, INC. AND MICHAEL REASONER**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



*ORIGINAL*

### VOLUME I - PAGES 1 THROUGH 129
### <u>DEPOSITION OF MICHAEL REASONER</u>

**Taken on Thursday, May 7, 2008**
**At the Offices of**
**LAW OFFICES OF JILL CRAFT**
**721 North Street**
**Baton Rouge, Louisiana  70802**

**REPORTED BY:  LORI COBB, C.C.R.**

## Court Reporters of Louisiana, LLC

Office: (225)-2...                    ...Louisiana   Fax: (225)-201-9651
Conference Room                       ...rtersla.com          Video Depositions
E-Transcripts     ASCII Disks/...                ...oms  Realtime Transcripts      Deponent Photo ID



EXHIBIT
I

```
 1        A     Yes.  It changed to Hilary Thibodeaux.
 2        Q     Can you give me an estimated time frame
 3   in which Mike D'Angelo was your supervisor?
 4        A     From the time I started until sometime
 5   in May of 2007.
 6        Q     I didn't make a note of it, so I
 7   apologize if I asked it already.  Can you tell me
 8   when you transferred to Shaw Coastal?
 9        A     I think it was in August of 2006.
10        Q     And were you under Hilary Thibodeaux's
11   supervision from June of '07 until September or
12   October of '07, I believe you said?
13        A     No.  That's not what I said.
14        Q     Okay.  Please correct me.
15        A     I said that whenever I transferred --
16   when I transferred from Houma to Shaw Coastal, I
17   believe it was in August of 2006.  And from August
18   of 2006, I reported to Mike D'Angelo until
19   sometime in May of 2007.
20        Q     All right.
21        A     That's when I reported to Hilary
22   Thibodeaux; and I reported to Hilary until they
23   fired me.
24        Q     Okay.  So from about May of '07 --
25        A     Yes.
```

```
 1          Q      -- until September or October of '07.
 2                 Tell me about your job duties as an
 3      engineering tech.
 4          A      When I had started off working for Mike
 5      D'Angelo, they just used me wherever I could fill
 6      in.  They knew I had field experience, budget
 7      experience and QA/QC experience dealing with
 8      specs, so I worked with the engineers preparing
 9      design specs, reviewing submittals, and I also
10      assisted with the survey crew.  I worked in the
11      field with Scott Thornton.
12          Q      Did those job duties change?
13          A      Yes.
14          Q      When?
15          A      In May, when I transferred to Hilary
16      Thibodeaux, they put me in charge of the CAD
17      Department; and they had four AutoCAD technicians.
18      They all reported to me.
19                 And I worked under Hilary.  I got
20      training on the hydrograph unit at the beginning
21      of -- the hydrograph survey equipment at the
22      beginning of 2007, maybe December or January --
23      December of '07 -- December of '06, January of
24      '07.  And after that, whenever hydrograph work was
25      needed, I performed the hydrograph work.
```

```
 1                    And I also worked for Oscar Pena, the
 2        projects that he was project manager on.  I
 3        tracked the budget and tracked the schedule and
 4        the costs, and prepared reports to him so he could
 5        see where he was against his budget, and where he
 6        was on the schedule and production.
 7             Q    When did you work for or under or
 8        directly with Oscar Pena?  Would that have been
 9        under the supervision of Hilary Thibodeaux?
10             A    Yes.  Hilary was always my manager, but
11        I also worked for Oscar on projects that he
12        delegated to me.
13             Q    Did you work on projects for Oscar that
14        he delegated to you while you were under the
15        supervision of Mike D'Angelo?
16             A    No.
17             Q    What was the reason that you were
18        transferred from the supervision of D'Angelo to
19        Thibodeaux?
20             A    Because they wanted to put someone over
21        the AutoCAD Department and they felt that I could
22        handle it; and since AutoCAD was under Hilary
23        already, they transferred me to him.
24             Q    What AutoCAD experience had you had at
25        that point in time?
```

```
 1          A    None.
 2          Q    Was your -- was your pay increased or
 3     decreased during your employment with Shaw or Shaw
 4     Coastal?
 5          A    When I started with Shaw in 2004, I made
 6     $14 an hour.  In January of '05, they increased me
 7     to 17 -- I believe it was over $17 an hour.  When
 8     I -- the next -- in February or March of '06, I
 9     got a 2.5 or 2 percent increase.
10               And then when I transferred to Shaw
11     Coastal, they paid me $42,000 a year plus
12     time-and-a-half overtime.
13          Q    And at the time you left Shaw Coastal,
14     was that your annual salary?
15          A    Yes.
16          Q    What is your position with Columbia?
17          A    Environmental Coordinator.
18          Q    What are your job duties?
19          A    I handle permitting, I handle
20     environmental projects, I handle waste disposal,
21     air reports to LDEQ, reports to EPA, and any other
22     various environmental tasks.
23          Q    Is it fair to say that it's, like, a
24     safety position?
25          A    No.
```

```
 1              A     No.
 2              Q     Have you ever been terminated or asked
 3         to resign from a job?
 4              A     I was terminated from Shaw.
 5              Q     Other than Shaw?
 6              A     No.
 7              Q     Where was your physical office located
 8         during your employment with Shaw Coastal?
 9              A     In the Houma office.
10              Q     Has any co-worker, other than
11         Mr. Cherry, ever filed a complaint against you
12         either with a supervisor or a human resources
13         department during any of your employment?
14              A     Not that I know of.
15              Q     Has any other person, other than
16         Mr. Cherry, ever accused you of sexual harassment?
17              A     No.
18              Q     Did you receive any training on sexual
19         harassment while you were employed with Shaw or
20         Shaw Coastal?
21              A     Yes.
22              Q     Tell me about it.
23              A     When I first started, I was given an
24         initial orientation by Trevor Stolzenburg.  It
25         included all of the Shaw policies; the harassment
```

```
 1          allow him to keep his employment.
 2             Q     Did you receive any pink slip or
 3          documentation informing you of your termination?
 4             A     An exit package.
 5             Q     And in that exit package, did it include
 6          any reason for your termination?
 7             A     Violation of the harassment policy.
 8             Q     Who told you you were terminated?
 9             A     Oscar Pena.
10             Q     Do you recall approximately when that
11          happened?  Was that -- let me ask you this.
12                   Was it a telephone conversation or was
13          it in person?
14             A     No.  It was in person.
15             Q     Do you recall the time frame?
16             A     It was either September or
17          October 27th of 2007.
18             Q     And tell me, how did that meeting take
19          place; did he call you in his office?
20             A     It was the afternoon at 2:30, 3:00, he
21          called me in.  Rose Bourg was already in there,
22          Nicki Jordan was on the phone as a conference
23          call.
24                   He explained to me that they received
25          two letters stating that I had harassed John
```

1    Cherry and that they believed I was violating the

2    harassment policy; that retaliation wouldn't be

3    tolerated, and that I was being terminated for

4    violating the harassment policy.

5         Q    Was this the first time you had become

6    aware of a complaint of harassment?

7         A    No.

8         Q    Okay.

9              Tell me about the first time you were

10   aware that Mr. Cherry had lodged or filed a

11   complaint of harassment against you.

12        A    It was in June of 2007.  And it may have

13   been June 18th or 16th, and it was the

14   afternoon.  I don't remember what time -- I don't

15   recall what time of day it was, but Nicki Jordan

16   came into my office and she closed the door.  And

17   I knew her because I had met her a few times at

18   the Shaw Coastal office, and I had met her once in

19   Houston.

20        Q    If I can interrupt you, what was her

21   position?

22        A    She was an HR rep or manager.  I didn't

23   know her title.  I knew she worked for HR.

24        Q    Okay.  You can continue.  She came into

25   your office and then what transpired?

```
 1      little bit later.
 2              Did she ask you any other questions or
 3      was it just centered around the text message?
 4          A    I don't recall any other questions,
 5      because I told her that I had filed paperwork and
 6      a complete description with Rose Bourg; and once
 7      she read that, she was satisfied.
 8          Q    Did she say she was satisfied?
 9          A    Yes.  She said, I think I see where this
10      is coming from.
11              And also Hilary, I had reported it to
12      Hilary Thibodeaux that I had had problems on
13      May 21 and May 22 with John Cherry and Scott.  And
14      he told Nikki that he knew why they were doing
15      that; it was because I had refused to work with
16      them and they were upset.
17          Q    Did you file that report or send that
18      report to Mr. Thibodeaux before you were aware of
19      any complaints on behalf of Mr. Cherry?
20          A    Yes.
21          Q    And why is it you didn't want to work
22      with Scott or John?
23          A    We worked on a project in New Orleans
24      called Than New Orleans.  It was ran by Mike
25      Oubre.  We worked on that off and on, but we went
```

```
 1      Human Resources -- I mean, she was the Houma
 2      office HR manager when she was in the office with
 3      Nikki Jordan.  And I believe I -- no, I don't
 4      think I talked to her after that day.  I don't
 5      recall speaking to her after the first day.
 6           Q     Were you interviewed by anyone else in
 7      connection with the investigation?
 8           A     After --
 9           Q     Anyone other than --
10           A     After Bernard Levy sent the letters to
11      Thornton and Cherry, I got a call from Jordan and
12      Bob Lindberg.  And they said, we just want to make
13      sure that you know that you can't do anything to
14      make it to where you can't work in the same place
15      as Thornton or Cherry, and I told them I
16      understood that.
17                 And they said, it's your right to send
18      the letters -- or it's your right to take legal
19      action, but you still have to work with these two
20      individuals.  And I told them I understood, and
21      that was the end of the conversation.
22           Q     Who was Bernard Levy?
23           A     He was a lawyer in Houma.
24           Q     Did you hire Mr. Levy to represent you?
25           A     I asked him to write the two letters.
```

```
 1           Q     And did you maintain -- did he continue
 2      to represent you?
 3           A     No.
 4           Q     Do you recall when the letters were sent
 5      out to Mr. Thornton and Mr. Cherry?
 6           A     The letters are dated, and they were
 7      sent out not long after a meeting took place with
 8      Nikki Jordan, Oscar Pena, Hilary Thibodeaux and
 9      Jeff Pena to go over the conclusion of the
10      investigation.
11           Q     When did you first hire Mr. Levy to send
12      the letters?
13           A     I didn't hire Mr. Levy.
14           Q     Did he represent you when he --
15           A     No.
16           Q     -- sent out the letters?
17           A     No.  He sent two letters.
18           Q     Who was he representing, if you know?
19           A     To my knowledge, I don't know who he was
20      representing.
21           Q     Did he send the letters on behalf of
22      you?
23           A     Yes.
24           Q     But it's your testimony he was not --
25      there was no attorney-client contract between the
```

```
 1       two of you?
 2           A     I don't recall.
 3           Q     Okay.
 4                 Well, tell me about your discussions
 5       with Bernard Levy, then.
 6           A     I had talked to him and told him what
 7       was going on.  And I told him that I didn't think
 8       Shaw was going to take any steps to stop these two
 9       individuals, and I was afraid of what they would
10       do if they weren't convinced to stop.
11           Q     And what did he say?
12           A     I asked him if he would write a letter
13       and request that they retract their statements,
14       and he agreed.
15           Q     Did you pay Mr. Levy any sum of money
16       for his writing the letters on your behalf?
17           A     No.
18           Q     And when you say you were afraid Shaw
19       would not take any steps to stop them; stop
20       Mr. Cherry?
21           A     To stop Scott Thornton and John Cherry.
22           Q     From doing what?
23           A     Thornton had already lied to Roy Samperi
24       and told Samperi that I was trying to get him
25       fired.  There was no basis for that.  So I was
```

SEP-10-2007 01:07 AM   L  KPORT*UPPER*ELEM.           985 532 6353           P 07

## SUPPLEMENTAL INTAKE QUESTIONNAIRE

EASE COMPLETE ALL SPACES

NAME: _John_____ _William_____ _Cherry_____
   (Please print)(First)        (Middle)              (Last)

Date of Birth: _12-06-66_____   Social Security No.: _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___

Your Race: _W_____ National Origin: _USA____ Your Sex: _M____

What day(s) and time(s) are you available by phone between 8:00 a.m. and 4:30 p.m. Monday through Friday:
_any_____

II. Date you began employment: _Jan. 07_____ Initial Job Title: _Instrument Man (Tech 1)_

Current Job: _Instrument Man (Tech 1)_ Current Salary: _$15.00/hour_

Department/Division and shift where currently employed: _Survey Department @ Shaw Coastal_

III. What specific action(s) did your employer take against you?
_failure to stop another employee in a management position_
_from sexually harassing and assaulting me._

IV. Do you believe the action was taken because of one or more of the categories listed below:

   ✓Yes ___No. If yes, place a check mark to the right of each category:

   Race___ Age___ Sex ✓ National Origin___ Religion___ Disability___ Other ✓ _Retaliation_

   Use area below to explain any of your choices, for example, state your national origin, religion or disability:
   _Because I am a male, I believe the company disregarded_
   _the allegations and told me that I had to go back to work._

What is the most recent date of the action taken against you?: _8-30-07_

VI. Who took this action against you? (Identify by Name, Race, Sex, Age, Religion, or National Origin):
   _Michael Reasoner, W, M, about 27, religion not known, USA)_

Give this person's job title: _Safety and Heath Manager, CAD Manager_

VII. What reason(s) did the employer give for taking this action against you?: _none_

EXHIBIT
J

EXHIBIT
32

1
09-07-07

D-00281
Cherry v. Shaw

SEP-10-2007 01:08 AM    L   KPORT*UPPER*ELEM.          985 532 6353          P.08

**VIII.** Why do you believe you have been discriminated against because of the reason(s) you checked in Section IV? State how you have been treated differently from the other employees of another race, sex, religion, national origion, etc. who have been involved in the same or similar circumstances. Identify those employees by name, race, sex, age, national origin, religion, etc. and briefly describe the situation giving dates and times these incidents occurred. (PLEASE CONTINUE ON PAGE 1., IF NECESSARY.)

I believe I was discriminated against because I was a man being sexually harassed by another man. I am not aware of any other cases of this nature.

**IX.** Please furnish the following for any witnesses to the event and an explanation of the information they can provide:

Witness: Scott Thornton
(Name)

(Address)
(936) 443-0798
(Telephone number)

Information this witness can provide:

Scott was an eye witness to the sexual touching, verbal comments, and text messages.

Witness: Wendy Falgout
(Name)

(Address)
(985) 868-3434
(Telephone number)

Information this witness can provide:

Wendy was an eye witness to Mr. Reasoner throwing his shoulder into my chest in the office hallway.

declare under penalty of perjury that the foregoing is true and correct.

John W. Cheney
gnature

7/2/07
ite

2

D-00282
Cherry v. Shaw

SEP-10-2007 01:08 AM   L  ?KPORT*UPPER*ELEM.          985 532 6353            P.09

# CHARGING PARTY SEXUAL HARASSMENT QUESTIONNAIRE

You have alleged that you were illegally discriminated against by being sexually harassed. We need the following information from you.  (Please think carefully before answering each question because you are asked at the end of the questionnaire to declare under penalty of perjury that your answers are true and correct.)

I was hired __Jan. 07__ ; my job title is/was __Instrument Man (Tech I)__ in (department)
__Surveying__ ; my pay is/was __9.50/hour__ . My supervisor.
(name, race, sex and age) __Mike D'Angelo__ . My department consisted
of (indicate number) _____ Blacks, _____ Hispanics, __3__ Whites, _____ Other (Please
specify) _____, _____ females and __3__ males, __2__ over the age of 40 and __1__
under the age of 40, _____ over the age of 40.

My company (circle one) did /did not give formal evaluations.  My evaluations were given
formal evaluations.  My evaluations were given by (name, race, sex, age, and job title) ____
__Mike D'Angelo, W, M, ?, Project Manager__

My ratings were (check one) _____ above average; _____ satisfactory; ____ unsatisfactory (did not receive yet)
I (circle one) was /was not given oral or written warnings while I was employed. My last two
warnings were given on (date) _____ by (name and job title) ____
__Mike D'Angelo, Project Manager__
because (reason warnings given) __Someone called in and said I was driving__
__too fast__

I was sexually harassed by (give name and job title) __Michael Reasoner, Safety and__
__Health Manager__
I reported the sexual harassment to (name and job title) __Scott Thornton, Party Chief__
__& Mike D'Angelo, Project Manager__ _____ on

1

D-00283
Cherry v. Shaw

(date(s) reported) 4/16/07 Scott Thornton; ② 5/3/07 (Mike D'Angelo)
③ 5/7/07
④ 5/22/07 (formal complaint to HR)

The sexual harassment began on (date) 4/16/07 and continued until (date, if ongoing state "continues") Continues

I was sexually harassed in the following manner (give specific instances and examples of exactly what happened to you. Include who committed each act and the date(s) each instance occurred): All harassment performed by Michael Reasoner: rubbing and caressing of arms, hair, inner thighs; trying to massage neck; sexual text messages including "I need cock." + a love poem, and other inappropriate messages; Mr. Reasoner told me that I could sleep by his house and not to worrying about bringing any clothes because I could wear his underwear. All above happened between April & May of 2007. On August 30, 2007, Mr. Reasoner threw his shoulder into my chest as I was standing in the hallway at the office.

I objected to being sexually harassed and I complained to or told (name, job title) Scott Thornton, Party Chief & Mike D'Angelo, Project Manager about it on 4/16/07                    5/3,7,22/07

made the following statement to (name and job title) Mike D'Angelo, Project Manager (state exactly what you told this person) I told Mr. D'Angelo that Mr. Reasoner was sexually touching me and sending me text messages. I told him that I wanted Mr. Reasoner away from me because I felt that I was being violated.

2

D-00284
Cherry v. Shaw

This person told me (state what you were told) that he hadn't been a situation like this before and he didn't know what to do. He stated that Mr. Reasoner was probably joking.

I (circle one (did)/did not report the sexual harassment to a management official. The following actions were taken by the company: HR conducted an investigation. At the end of the investigation I was told that because of Mr. Reasoner's position in the company that I had to go back to work with him.

_____. (If you did

not report the sexual harassment give the reason(s) why you did not:_____

Since I objected to and reported the sexual harassment, my work environment (circle one) has/(has not) changed. The following actions have occurred: Mr. Reasoner still makes gestures to me (smirking, laughing, hand gestures - middle finger) last incident on 8-30-07 of throwing shoulder into my chest

3

D-00285
Cherry v. Shaw

There (circle one) has/has not been a change since I reported the sexual harassment. I (circle one) do/do not feel that the change is because I reported the harassment.

others who have been or may have been sexually harassed are (give the names, addresses, telephone numbers, the name and job title of the harasser, and the date(s) of the harassment):

_____

_____

_____

_____

_____

The following is additional information which may help the Commission understand the circumstances regarding the harassment: _____

_____

_____

_____

_____

_____

Below are the names, addresses and telephone numbers of witnesses who can give **first hand knowledge or evidence of my allegations**. I did not list character witnesses, i.e. relatives, friends, etc. These are persons who **saw, heard, received the same information, etc.**:

Scott Thornton (sexual allegations ) 936-443-0798

Wendy Falgout (only 8/30/07 assault) (985) 868-3434 (sheriff office number)

4

D-00286
Cherry v. Shaw

SEP-10-2007 01:10 AM   LOCKPORT*UPPER*ELEM.   985 532 6353   P 15

_____

_____

_____

_____

(The EEOC representative may ask you to indicate what information each witness can be expected to give.)

If you need more space to answer any of the above questions, you may use the space below or attach additional sheets.

I declare (certify, verify, or state) under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

9/7/07
Date

John W Cheery Jr
Printed Name

_Signature_

5

D-00287
Cherry v. Shaw

Why do you believe this action was taken against you?

I feel like Shaw covered up these allegations because of Mr. Reosmer's position in the company.

EXHIBIT

33

Normally, your identity as a complainant will be disclosed to the organization which allegedly discriminated against you.
Do you [✓] consent or [ ] not consent to such disclosures?

Have you sought assistance about the action you think was discriminatory from any agency, from your union, an attorney, or f
ce? [ ] No [✓] Yes (If answer is yes, complete below.)

NAME OF SOURCE ASSISTANCE  Shaw Group's HR Department

RESULTS IF ANY: I was told that I had to go back to work with Mr. Reosener    DATE late May '07

Have you filed a complaint about the action you think was discriminatory with any other Federal, State, or Local Government A
agency? [✓] No [ ] Yes (If answer is yes, complete below.)

NAME OF SOURCE ASSISTANCE

RESULTS IF ANY: _____    DATE _____

Have you filed an EEOC Charge in the past? [✓] No [ ] Yes    (If answer is yes, complete below)
APPROX. DATE FILED    ORGANIZATION CHARGED    CHARGE NUMBER (IF KNOWN)

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE _____    DATE 9/7/07

PRIVACY ACT STATEMENT: This form is covered by the Privacy Act of 1974: Public Law 93-579. Authority for requesting personal data and the us
   FORM NUMBER/TITLE/DATE, EEOC Form 283, Charge Questionnaire (12/93),
.  AUTHORITY, 42 U.S.C. § 2000e-5(b), 29 U.S.C. § 211, 29 U.S.C. § 626, 42 U.S.C. 12117(a)
3.  PRINCIPAL PURPOSE. The purpose of this questionnaire is to solicit information in an acceptable form consistent with statutory requirements t
   Commission to act on matters within its jurisdiction. When this form constitutes the only timely written statement of allegations of employment
   Commission will, consistent with 29 CFR 1601.12(b) and 29 CFR 1626.8(b), consider it to be a sufficient charge of discrimination under the rele
   ROUTINE USES. Information provided on this form will be used by Commission employees to determine the existence of facts relevant to a dec
   the Commission has jurisdiction over allegations of employment discrimination and to provide such charge filing counseling as is appropriate. In
   orm may be disclosed to other State, local and federal agencies as may be appropriate or necessary to carrying out the Commission's functi
   be disclosed to charging parties in consideration of or in connection with litigation.
   WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION. The providing
   r this information is   voluntary but the failure to do so may hamper the Commission's investigation of a charge of discrimination. It is not manda
   requested information.

Reverse Side of Form 283.(Test 10/94)

D-00263
Cherry v. Shaw

# CHARGE QUESTIONNAIRE

EEOC Use Only    Name (Intake Officer)

This form is affected by the Privacy Act of 1974; see Privacy Act Statement on back before completing this form.

Please answer the following questions, telling us briefly why you believe you have been discriminated against in employment with you after you complete this form.

Social Security Number   545 - 23 - 9433

NAME   John   W.   (Middle Name or Initial)   Cherry   DATE 9-7-07
       (First)                                (Last)

ADDRESS   151 Leonard St.

CITY   Raceland   STATE   LA   ZIP 70394   COUNTY Lafourche

TELEPHONE NO. (Include area code) (985) 258-1114

Please provide the name of an individual at a different address in your local area who would know how to reach you.

NAME   Peggy Forrestier   RELATIONSHIP   mother   PHONE

ADDRESS

---

I believe I was discriminated against by: (Check those that apply)

[✓] EMPLOYER
APPROX NO. EMPLOYED BY
THIS EMPLOYER

[ ] UNION (Give Local No.)

[ ] EMPLOYMENT AGENCY

[ ] OTHER (Specify)

NAME   Shaw Coastal (The Shaw Group)
ADDRESS   197 Elysian Dr.

CITY, STATE, ZIP   Houma, LA   70363

NAME

ADDRESS   SEP 1 4 2007

CITY, STATE, ZIP

**EXHIBIT 33**

If you checked "Employer" above, are you now employed by the Employer that you believed discriminated against you?

YES: From   Jan 07   NO: I applied for                        OR: I was employed as
     (date)                              (position)                           (position)

Instrument Man                        on                    until                I was
(current position)                         (Date)              (date)        (laid off, fired, etc.)

What action was taken against you that you believe to be discriminatory? What harm, if any, was caused to you or others in your that action? (If more space is required, use reverse.)

Between the months of April and May, I was sexually harassed by Michael Reasoner, Shaw's Safety and Health Manager. I reported these actions to my supervisors twice, and the harassment did not stop. On the third complaint to my supervisor, I had to ask for a formal complaint to be filed to HR. An investigation took place, then I was told because of Mr. Reasoner's position with the company, that I had to go back to work with him and the harassment never stopped. Because of the harassment, I felt that I was violated. I couldn't sleep because my thoughts were always on wanting these actions to be stopped. My home

WHAT WAS THE MOST RECENT DATE THE HARM YOU ALLEGED TOOK PLACE?   8-30-07

EEOC Form 283 (Test 10/94)

09-07-07

D-00262
Cherry v. Shaw



**State of Louisiana**
Louisiana Commission on Human Rights
Post Office Box 94094
Baton Rouge, Louisiana 70804-9094



EXHIBIT
34

## COMPLAINT QUESTIONNAIRE

LCHR USE ONLY.

Last Name Cherry   First Name John   Middle initial W.

Street Address 151 Leonard St.   Parish Lafourche

City Raceland   State LA   Zip Code 70394

| 40 Age | 12-06-66 Date of Birth | M Sex | W Race | 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 Social Security Number | (985) 258-1114 Telephone Number |
|---|---|---|---|---|---|

I believe I have been discriminated against in:

Banking & Lending _____      Employment ✓      Public Accommodations _____

I believe I have been discriminated against because of my:

Race _____   Color _____   Sex ✓   Age _____   Disability _____   Religion _____   National Origin _____

Sickle Cell Trait _____      Pregnancy, Childbirth, and Related Medical Conditions _____   ✓ Retaliation

Employer's

Name Shaw Coastal (The Shaw Group)

Address 197 Elysian Dr.

City Houma   State LA   ZipCode 70363   Parish Terrebonne

Number of Employees 500+      Date of last act of alleged discrimination 8-30-07

Telephone (985) 868-3434   Name of Person who allegedly discriminated against you Mike Personer

Are you presently employed by the Entity that you believe discriminated against you? Yes ✓   No _____

Dates of Employment Jan.07-present

Job Title Instrument Man

D-00278
Cherry v. Shaw

09-07-07

Have you filed a complaint with any agency other than this office?

✓ Yes (if so, complete the area below) _____ No

Name Shaw Group's HR Department

Address _____

Phone Number _____

Results, if any I was told that we all have to work together

Sign here if you agree to have the results of the above-mentioned investigation released to the Louisiana Commission on Human Rights _____

If you have an Attorney, please provide the Attorney's name, address and telephone number.

Jill L. Craft, 720 North St., Baton Rouge, LA

Briefly explain the action taken that you believe to be discriminatory.

Between the months of April and May, I was sexually harassed by Michael Reasoner, Shaw's Safety and Health Manager. I reported these actions to my supervisors twice and the harassment did not stop. On the third complaint, I asked for a formal complaint to be filed with HR. An investigation took place, then I was told because of Mr. Reasoner's position with the company that I had to go back to work with him and the harassment never stopped.

I solemnly swear or affirm that all of the information provided on this form is true and accurate to the best of my knowledge.

Signature _____   Date 9/7/07

D-00279
Cherry v. Shaw

### AFFIDAVIT

STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

BEFORE ME, the undersigned Notary Public, personally came and appeared:

Scott Thornton

a resident of the full age of majority of Houston, Texas, who upon being duly sworn did depose and state that:

-I was employed with Shaw from 2005 until September, 2007. I was employed by Shaw in the Houma office as a Technician III and my duties consisted of surveying, processing, for a period of time, also over equipment, and providing input for job bidding purposes. While employed at Shaw, at first I reported directly to Henry Schwartz, who left Shaw's employment, and then I reported directly to Mike D'Angelo until the last day I was employed by Shaw.

-Mike D'Angelo reported directly to Jeff Pena. Jeff Pena reported directly to Oscar Pena, his father. Mike D'Angelo told me that the chain of command was from him to Jeff Pena and then to Oscar Pena in the Houma office.

-During March, 2007, and April, 2007, I worked on a survey crew consisting of myself, John Cherry, and Mike Reasoner. We did surveying work during this time on the Amite River. During this time, I personally witnessed Mike Reasoner make comments to John Cherry as follows: "it looks like you work out", "you are in good shape for an old man", "you are sexy for an old man", he told John Cherry that he and his friends would go to a camp with him and that they would use a penis pump and that one of his friends who used the pump made his penis "so big it fell over his arm", he asked John Cherry to spend the night with him, that John Cherry didn't need any clothes because "John, you can wear my underwear", he and a Priest were in confession and that he and the Priest would talk about "jerking off together", that he called his penis "the big dipper" and told John Cherry "you know you want/need the dipper", that John Cherry was "sexy" and he "looks good today", he told John Cherry that he should pull his pants down for him and cut his pants off short for him. I personally witnessed Mike Reasoner make at least one or more of these comments directly to John Cherry every day we worked together.

-After the sexual comments by Mike Reasoner to John Cherry started in March, 2007, within about a week, I personally witnessed Mike Reasoner stroke John Cherry's hair, massage his shoulders, rub his arms, rub his legs, his lower back/buttocks in a sexual manner. I personally witnessed Mike Reasoner sexually touching John Cherry just about every day we worked together. I specifically remember on one occasion, we were in a boat (Reasoner, Cherry, and I) on the Amite River, John Cherry was driving the boat, Mike Reasoner stood up behind John Cherry and began massaging John Cherry's shoulder. John Cherry jumped up from his seat and yelled at Reasoner to stop. I

1



specifically remember one occasion on a boat, stopped in the Amite River, John Cherry was sitting on the boat's gas tank, Reasoner approached him, sat down next to him and began rubbing John Cherry's inner thigh. John Cherry cursed Reasoner and told him to stop. I remember that almost every time Reasoner would pass John Cherry, he would reach out and stroke/rub him. I specifically remember several occasions when the three of us were riding in the Shaw truck and Reasoner was in the back seat and John Cherry was in the front passenger seat and Reasoner would reach over the passenger seat and stroke John Cherry's hair, rub his shoulders. I specifically remember several occasions when Reasoner was driving and John Cherry was in the passenger seat and Reasoner would reach over to John Cherry and rub/massage John Cherry's leg and arm.

-On every occasion that Reasoner either made a sexual comment to John Cherry or touched John Cherry in a sexual manner, John Cherry told Reasoner to stop, including cursing at Reasoner to stop, telling Reasoner that he would (words to the effect) hit him if he didn't stop.

-I personally witnessed a text message appear on John Cherry's cell phone from Reasoner that was sexual. John Cherry and I were on the Amite River bank taking GPS shots and Reasoner was on the boat alone. John Cherry called me over to him and showed me his cell phone and on John Cherry's cell phone was a text message from Reasoner's phone to John Cherry's phone that said "I need cock." I looked at my phone to determine who was the sender's number. The sender's number was Reasoner. I also saw a "love-type" poem to John Cherry's phone from Reasoner. On this occasion, John Cherry and I were in Plaquemines Parish taking survey and GPS on the levee across the street from the gas refinery south of Myrtle Grove. Reasoner was not on this job with us. I also personally witnessed a text message to John Cherry's phone from Reasoner's phone about John Cherry "taking a shit" and a text message to John Cherry's phone from Reasoner's phone "you missed the big dipper" referring to his [Reasoner's] penis.

-In May, 2007, Reasoner, John Cherry, and I went out for a surveying job at the Port of West St. Mary's. In the truck, I personally witnessed Reasoner reach over and stroke John Cherry's hair and massage his shoulders. John Cherry had dozed off. John Cherry woke up when Reasoner started rubbing him, got angry and yelled at Reasoner to stop.

-The next time we (Reasoner, John Cherry, and I) went out to West St. Mary's, it was raining that day when we arrived at the site. I told Reasoner and John Cherry we could not start the job because our equipment is not supposed to get wet. I called Mike D'Angelo and told him it was raining on the job and asked him if he wanted us to come back to the office or wait to see if the rain will stop. D'Angelo told us to wait. Reasoner got out of the truck and went to the boat and started setting up the equipment in the rain. I instructed John Cherry to go and tell Reasoner to stop setting up the equipment because it can't get wet. Reasoner refused and continued to set up the equipment in the rain. I again sent John Cherry to Reasoner to tell him to put up the equipment out of the rain. I called D'Angelo again and he told us to go ahead and take an early lunch and come back to the job site to see if the weather had broken and if it hadn't, then go ahead and come back to the office. I told D'Angelo on the phone that I was having problems with Reasoner. Reasoner then angrily approached me in the truck, jerked open the driver's door, and yelled "we need to get this job done"

2

and I told him "no" and he said then "I'm turning you in".   Reasoner continued to yell in the truck

-I reported Reasoner sexually harassing John Cherry to Mike D'Angelo on several occasions. The first time I reported Reasoner to Mike D'Angelo was after the first time I witnessed Reasoner stroking John Cherry. I went into D'Angelo's office and I told him that I had told Reasoner a whole bunch of times to stop, that Reasoner is rubbing on John Cherry's hair, arms, shoulders, and legs in a way "like I would touch my wife" and that it wouldn't stop. D'Angelo asked me if I thought Reasoner was just playing around and I told him no, this was not a joke. After this first time, Reasoner continued sexually harassing John Cherry and I went back to report it again to D'Angelo several times, approximately 3-4 more times. Each time, D'Angelo would ask me if I thought Reasoner was "playing around" and I told him no.

-I told Jeff Pena about the sexual harassment on two (2) occasions. The first time (April, 2007) I reported it to Jeff Pena, I was walking by his office and he called me into his office and asked me "what's going on with John Cherry and Mike Reasoner?" I told him that Reasoner was touching John Cherry in the same manner that "I would touch my wife" and told him that John Cherry had gotten sexual text messages from Reasoner and told him that Reasoner was making sexual comments to John Cherry. Jeff Pena leaned back in this chair and said "are you sure" several times and I told him each time "yes." In May, 2007, I was in the copier area in the front of the building. Jeff Pena came into the area and I was already talking to D'Angelo about Reasoner being insubordinate. I then told Jeff Pena about Reasoner being insubordinate (St. Mary's rain day). Jeff Pena then told me that Reasoner was filing something against me and I proceeded to tell him about the rain and he agreed that the equipment can't get wet and that I was right. I told Jeff Pena with all that crap going on with John (Cherry) that hasn't stopped, and now Reasoner is causing problems with me now and they need to stop it.

-I never met Nikki Jordan nor did she interview or question me at all until the day I was called into the office to meet with (as she introduced herself) Nikki Jordan, Oscar Pena, Jeff Pena in Oscar's office. Oscar Pena told me that I have to be professional, the investigation is over, we all have to get along, and that I was a supervisor and you know how management works.

-Right before this meeting, I was put on only 40 hours by Mike D'Angelo cut from 50+ hours and he told me that came from Jeff and Oscar. John Cherry and myself had been moved to another office toward the back of the building. Reasoner would walk by our office, and laugh and point at John Cherry and I repeatedly. I reported this Reasoner conduct to D'Angelo and Jeff Pena and specifically told them what was going on and that they needed to get Reasoner to quit going by the office. I also gave this information to Nikki Jordan. Jordan told me I can't control him in the workplace. I sent Nikki emails and told her about Reasoner's continuing behavior and told her by phone that Reasoner wasn't stopping.

-On August 30, 2007, Wendy Falgout came into my office and said that Mike Reasoner hit John Cherry in the hall. I told D'Angelo and specifically told D'Angelo that I didn't see it but Wendy Falgout just told me about it and that he needed to go talk to Wendy about it.

3

-I quit my job with Shaw as a result of the stress relating to what I had continually reported to Shaw and Shaw did nothing about it and I believed they were going to get rid of me because I reported it, they had already cut my hours right after I reported it.

-I quit in good standing meaning that I gave two (2) weeks notice.

-This Affidavit is made upon my personal knowledge.

Scott Thornton

SWORN TO AND SUBSCRIBED before me, Notary Public, this 23 day of February, 2009.

DEBORAH SUE DOUD
MY COMMISSION EXPIRES
June 21, 2011

Deborah Sue Doud

4

BERNARD F. LEVY

Attorney-at-Law

209 GOODE ST.
SUITE 204
HOUMA, LOUISIANA 70360
TELEPHONE (985) 851-5238
FAX (985) 851-5239
E-MAIL: levylaw@bellsouth.net

August 6, 2007

Mr. John Cherry
151 Leonard Street
Raceland, LA 70394

Re: Mr. Michael Reasoner

Dear Mr. Cherry:

I have been retained by Mr. Reasoner in regard to the false, scurrilous, slanderous and defamatory allegations of sexual harassment you have made against him. On behalf of Mr. Reasoner I demand that you immediately retract said false allegations made to Shaw Coastal, Inc. I further demand that you desist for any future false and libelous allegations.

Failing your immediate acquiesce to the demands herein, including confirmation of withdrawal of the allegations made to Shaw Coastal, Inc. I will institute appropriate legal action against you for monetary damages.

Very truly yours,

Bernard F. Levy

BFL:csb
cc: Michael Reasoner

